AO 91 (Rev. 11/11)   Criminal Complaint

LODGED
CLERK, U.S. DISTRICT COURT

01/06/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____AP_____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

01/06/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: D. Brown DEPUTY

| United States of America | ) |
| v. | ) |
| | ) |
| Osbaldo Campos, Jr. | ) Case No. |
| | ) |
| | ) 5:22-mj-00005 |
| | ) |
| | ) |
| _____ | ) |
| Defendant(s) | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of    November 26, 2021    in the county of    San Barnardino    in the
Central    District of    California    , the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. §§ 2113(a) | Bank Robbery |
| 924(c) | Possession of Firearm in Furtherance of a Crime of Violence |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

/s/ pursuant to Fed. R. Crim. P. 4.1
*Complainant's signature*

Special Agent Thomas D. Lobach
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    January 6, 2022

*Judge's signature*

City and state:    Riverside, California        Honorable Kenly Kiya Kato, U.S. Magistrate Judge
*Printed name and title*

*AUSA:* Peter Dahlquist

**AFFIDAVIT**

I, Thomas D. Lobach, being duly sworn, declare and state as follows:

**PURPOSE OF AFFIDAVIT**

1. This affidavit is made in support of a criminal complaint and an arrest warrant against Osbaldo Campos, Jr. ("CAMPOS") for violations of 18 U.S.C. §§ 2113(a) (Bank Robbery) and 924(c) (Possession of Firearm in Furtherance of a Crime of Violence) (the "Subject Offenses") on November 26, 2021 in Redlands, California, within San Bernardino County.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), currently in the custody of the Federal Bureau of Investigation in Riverside, California, as described more fully in Attachment A:

    a. Silver and white iPhone X in a black Otterbox case ("SUBJECT DEVICE 1"); and

    b. Black iPhone X in a black Otterbox case ("SUBJECT DEVICE 2").

3. The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and part only.

## BACKGROUND OF SPECIAL AGENT THOMAS D. LOBACH

4.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since June 2021.  I am currently assigned to the FBI, Los Angeles Field Division, Riverside Resident Agency, and I am also a member of the Inland Empire Safe Streets Task Force.  This task force consists of investigators from the FBI, Internal Revenue Service ("IRS"), and the Riverside County Sheriff's Department ("RSO")

5.    I have received 22 weeks (approximately 840 hours) of instruction in the fundamentals of law, ethics, behavioral science, interviewing, report writing, firearms, surveillance, defensive tactics, and case management at the FBI Academy in Quantico, Virginia.  Through the course of my employment with the FBI, I have participated in a variety of investigations, including gang, violent crimes against children, and drug trafficking.

6.    As an SA, I have received instructions in the identification, collection, and preservation of evidence, photography, latent print collection, and crime-scene investigations.  I have also assisted in criminal investigations, including compiling information; interviewing complainants, and witnesses; and logging evidence to support the filing of criminal complaints and search warrants.

## SUMMARY OF PROBABLE CAUSE

7.    On November 26, 2021, officers caught CAMPOS, just after he had robbed a US Bank in Redlands, California.  CAMPOS was running away from the bank and towards his Nissan Maxima when he was stopped by officers.  CAMPOS resisted the officers, and at one point, reached with his right hand towards his right hip where he had a loaded semi-automatic pistol holstered on his belt.  Officers seized the pistol and found it was loaded with 15 rounds of ammunition and found an additional round in the chamber.  Also, on CAMPOS's belt, officers found four additional fully loaded magazines.  Officer then searched the Nissan Maxima that CAMPOS was attempting to enter as he was arrested, and officers found two assault rifles, another rifle, hundreds of rounds of ammunition loaded into magazines, and hundreds of rounds of ammunition in boxes.

8.    Based on my review of surveillance video, in addition to other evidence, I also believe that CAMPOS robbed another bank in San Bernardino on October 8, 2021.  During that robbery, CAMPOS wore the same attire, drove what appears to the same vehicle, and brandished what appears to be the same gun he possessed on the day of his November 26, 2021 arrest.  I have compared images of the robber from bank surveillance video of the October 8, 2021 robbery with images of CAMPOS from the November 26, 2021 arrest and believe the images depict the same person.

## STATEMENT OF PROBABLE CAUSE

9.    Based primarily on my review of a Redlands Police
Department Report in incident number 210040063, my review of
photographs and video footage from the banks that were robbed,
my review of a San Bernardino Police Department report in case
number 2021-114044, my review of other reports, conversations
with other law enforcement agents, and my own knowledge of the
investigation, I am aware of the following:

**A.    Officers Respond to Robbery of US Bank in Redlands on November 26, 2021**

        **1.    CAMPOS Robs US Bank in Redlands with Demand Note Stating "He has a gun give him 30.K fast"**

10.    On November 26, 2021 at approximately 2:34 p.m., a
man, later identified as CAMPOS, robbed the US Bank located at
640 Orange Street in Redlands California (the "Redlands US
Bank").[1]  CAMPOS entered the bank, approached bank employee
M.R., sat at a chair in front of M.R.'s desk, and stated he
wanted to open an account.  CAMPOS then took out a large amount
of what M.R. believed to be counterfeit money and placed it on
M.R.'s desk.  CAMPOS told M.R. that he needed $30,000 because
his house was being foreclosed on and then he slid a demand note
to M.R. that stated, "He has a gun give him 30.K fast."  Bank
manager S.B. then walked to M.R.'s desk and CAMPOS handed S.B.
the demand note.  CAMPOS then told S.B., "hurry up, get it now."
S.B. then walked with CAMPOS to the teller window.  As he was
walking to the teller window, S.B. felt CAMPOS forcibly push

---

[1] As of November 26, 2021, the deposits of the Redlands US
Bank were insured by the Federal Deposit Insurance Corporation.

against him and felt a hard object in the front waistband of
CAMPOS's pants.  S.B. believed CAMPOS had a gun and he was in
fear for his life.

11.  When S.B. arrived at the teller window, he asked
CAMPOS to wait at the teller window as S.B. walked through the
employee entrance to go the teller desks.  S.B. told bank teller
J.V. to give CAMPOS all the cash from her teller drawer.  J.V.
complied, but also triggered the silent alarm at her teller
station.  S.B. then gave CAMPOS all the money from another
teller drawer and asked G.H., another teller, to give CAMPOS all
of the cash from her teller drawer.

12.  After receiving the cash from the teller drawers,
CAMPOS told S.B. to go into the vault and get him the $30,000 he
wanted.  S.B. and G.H. then went into the vault, and retrieved
$30,000, but when they came back out of the vault, CAMPOS had
already left then bank and was running away from the bank in a
southeast direction.

2.    CAMPOS Runs to His Vehicle, Resists Arrest, and
      Reaches for His Holster While Resisting

13.  At approximately 2:34 p.m., Officers from Redlands
Police Department ("RPD") responded to a report of a bank
robbery in progress at the Redlands US Bank.  Sergeant E.
Valenzuela, one of the first officers to arrive at the scene,
initially began driving to the scene and heard an RPD dispatch
operator say that the suspect was wearing a black mask, black
shirt, and black pants.

14.  As Sergeant Valenzuela arrived in his unmarked vehicle, he saw a man, matching the description provided by the RPD dispatch operator, walking out of the bank.  The man, later identified as CAMPOS, was wearing a black, long sleeve sweater, black pants, and a black face mask.  Sergeant Valenzuela also saw a gun holster on CAMPOS's right hip that was protruding from under his shirt.  Sergeant Valenzuela notified other responding units that he had observed a weapon and informed officers of CAMPOS's direction of travel.  At that point, CAMPOS began running from the bank.  He also reached into his sweater pocket, and as he did, Officer Valenzuela saw money fall out of CAMPOS's pocket.

15.  Sergeant Valenzuela then got out of his vehicle and began chasing CAMPOS.  As Sergeant Valenzuela chased CAMPOS, Sergeant Valenzuela announced he was a police officer and ordered CAMPOS not to reach for his weapon or he would be shot.

16.  As CAMPOS ran, he approached a 2021, grey, four-door Nissan Maxima (the "Nissan") with no license plates and attempted to unlock the Nissan and enter the driver's side door. Sergeant Valenzuela, along with other arriving officers, commanded CAMPOS to get on the ground and not to reach for his weapon, but CAMPOS did not initially comply.  After several warnings form officers, CAMPOS got down on his hands and knees, but refused to lay flat on the ground.

17.  Sergeant D. Sardegna, who assisted with arresting CAMPOS, wrote in a supplemental report that he noticed that as Sergeant Valenzuela and a second officer were trying to control

CAMPOS's right hand, CAMPOS attempted to "maneuver his right hand towards his right waist band where [Sergeant Sardenga] could see a semi-automatic pistol protruding from his [CAMPOS's] hip."

18. Similarly, Sergeant Valenzuela reported CAMPOS would not give officers his right hand, which was the side the weapon was on, so Sergeant Valenzuela used his knee to strike CAMPOS's left side and commanded CAMPOS to give officers his right hand to be restrained. Officers were then able to restrain CAMPOS and searched him.

### 3.   Officers Find Loaded Handgun and Four Spare Magazines on CAMPOS's Belt

19. Once CAMPOS was restrained, Sergeant Valenzuela removed a black web belt from his waisted and recovered a black and silver Smith & Wesson, 9mm semi-automatic handgun (the "Smith & Wesson Pistol"). Sergeant Valenzuela removed a total of 16 rounds of ammunition that was loaded in the Smith & Wesson Pistol, including a round in the chamber. Officers found four extra, loaded 9mm magazines in magazine pouches on CAMPOS's belt.

20. CAMPOS also had the key to the Nissan he was attempting to enter at the time he was arrested. Finally, CAMPOS had a total of $21,456.

4.   Officers Find Loaded Assault Rifles, High-Capacity Magazines, and High-Caliber Ammunition in CAMPOS's Car

21.   After detaining CAMPOS, officers searched the Nissan and found the following firearms, ammunition, and firearm magazines:

a.   a Smith & Wesson AR-10 rifle with serial number KN 68584 with attached scope;

b.   a Smith & Wesson AR-15 rifle with serial number TS 76921 with attached holographic sight;

c.   a Ruger mini-14 rifle with serial number 984 35475;

d.   a 9mm magazine loaded with 16 rounds of 9mm ammunition;

e.   a 9mm magazine loaded with 10 rounds of 9mm ammunition;

f.   two 40-round AR-15 magazines that were attached together and loaded with a total 79 rounds of 5.56 caliber ammunition;

g.   six additional 40-round AR-15 magazines that were each loaded with between 10 and 40 rounds of 5.56 caliber ammunition;

h.   two AR-10 magazines loaded with a total of 20 rounds of .308 caliber ammunition;

i.   four empty mini-14 magazines;

j.   one empty pistol magazine; and

k.   several boxes of ammunition containing hundreds of additional rounds of ammunition.

22.   In total, CAMPOS possessed 77 rounds of ammunition on his person and officers located 364 rounds of ammunition loaded in magazines inside the Nissan.  Those totals do not include the hundreds of additional rounds of ammunition that were in the ammunition boxes in the Nissan.

23.   In the back of the Nissan, officers found a sleeping bag, a gray blanket, two pillows, a duffle bag with toiletry items, a security officer shirt, a black security officer jacket with a badge, and other items of clothing.

24.   In the center console, officers found the SUBJECT DEVICES.  As outlined in greater detail below, I believe the SUBJECT DEVICES will contain evidence of the Subject Offenses. The SUBJECT DEVICES will likely contain records relating to planning the robberies and scouting the robbery locations.  The location information for the SUBJECT DEVICES will also reveal further scouting activity in the days leading up to the robberies.  Also, because the SUBJECT DEVICES were at the scene of the Redlands US Bank robbery location, it is likely they were also at the scene of the San Bernardino robbery and location data and other information from the SUBJECT DEVICES could help confirm the identify of CAMPOS as the robber of the San Bernardino US Bank location.

25.   In the trunk of the Nissan, officers found index cards (matching the card the demand note was written on).  Officers also found "Movie Picture Use Only" replica US currency that matched the type of prop money CAMPOS had on his person that was mixed with currency he had robbed from the bank.  In the trunk,

officers also found firearm range qualification certificates issued to CAMPOS for the calibers of 9mm, .40, .45, .38, and .357.

       5.   <u>Bank Employees Identify CAMPOS as the Robber</u>

26.  Officers conducted separate, individual field identification procedures with S.B., M.R., and H.G.  With each witness, officers read a field identification admonishment advisal informing the witnesses that they were not obligated to identify the person presented, they should not draw any conclusion about the person just because the person was in custody, and they should not speak to anyone while viewing the person.

27.  After reading the admonishment, during separate identifications procedures, officers allowed the witnesses to see CAMPOS and then asked each witness if they recognized CAMPOS:

      a.  S.B. stated CAMPOS was the person who robbed the bank and reported he was 100% confident in the identification.

      b.  M.R. stated CAMPOS was the person who robbed the bank and reported she was 100% confident the identification.

      c.  H.G stated CAMPOS was the person who robbed the bank and reported she was 100% positive about the identification.

       6.   <u>CAMPOS States "I did not want to hurt anyone";</u>
           <u>the San Bernardino Superior Court Set His Bail</u>
           <u>Amount at $750,000, Which He Has Not Met</u>

28.  While CAMPOS was sitting in the back seat of a patrol vehicle, he initiated a conversation with Officer G. Caddel and

stated, "just having a bad day, you know what I mean."  Officer Caddel replied, "No, I don't."  CAMPOS then stated, "I did not want to hurt anyone," to which Officer Caddel responded, "You took a gun into a building full of people."  CAMPOS then stated, "I did not point my gun at anyone though."  "At no time did I point a gun at someone."

29.  CAMPOS was booked into county jail, and was charged in San Bernardino County Superior Court with robbery.  His bail was set at $750,000.  He has not posted bail, and  therefore he has been in state custody since his arrest.

**B.    Robbery at US Bank in San Bernardino on October 8, 2021**

       1.    <u>CAMPOS Robs San Bernardino US Bank</u>

30.  On October 8, 2021, at about 11:23 a.m., a suspect, who I now can identify as CAMPOS, robbed the US Bank located at 4594 North University Parkway in San Bernardino, California (the "San Bernardino US Bank").[2]  During that robbery, CAMPOS came into the bank, approached bank employee P.S. and stated, "I am here to make a deposit."  P.S. said CAMPOS then pulled a silver-color semi-automatic handgun from a black holster and told P.S., "take me to your vault."  CAMPOS further said, "I'm losing my home and I'm going through a bad situation."  P.S. and bank manager T.H. then took CAMPOS to the vault where T.H. gave CAMPOS six stacks of $10,000 bundles, totaling $60,000.  CAMPOS

---

[2] As of October 8, 2021, the deposits of the San Bernardino US Bank were insured by the Federal Deposit Insurance Corporation.

told T.H., "I got to pay off my house."  CAMPOS then left the
San Bernardino US Bank.

31.  San Bernardino Police Department investigators
gathered exterior surveillance video from businesses surrounding
the San Bernardino US Bank, and based on analysis of video of
the robber leaving the scene toward a specific parking lot and
analysis of vehicles leaving that parking lot, in an initial
October 18, 2021 report (well before the later November robbery
when CAMPOS was arrested trying to get into the Nissan), the
lead detective investigating that robbery identified the getaway
vehicle as a 2021, grey, four-door Nissan Maxima.

32.  Reviewing the information and images from surveillance
images from inside the bank during the robbery of the Redlands
US Bank and the San Bernardino US Bank, and images of CAMPOS
after his arrest, I believe CAMPOS robbed the San Bernardino
bank based on the following details:

a.   I have reviewed the images from CAMPOS's arrest
and compared those images to the images from interior
surveillance of the robbery at the San Bernardino US Bank and
believe the images are of the same person.  Even though the
CAMPOS's face is partially covered by a black, disposable mask
in the images from the San Bernardino US Bank robbery, when
CAMPOS's exited the San Bernardino US Bank, a camera caught a
good image of CAMPOS's face where his mask had fallen below his
nose.  I compared that image against images from CAMPOS's arrest
and I am confident the images depict the same person.

b.    The robber of the San Bernardino US Bank location wore what appears to be the same attire that CAMPOS wore in the Redlands US Bank robbery: a black, Nike jacket; black pants; black mask; and black shoes.  The Nike jacket CAMPOS wore in both robberies has the Nike "swoosh" on the left breast and a distinct white stripe on the right cuff.

c.    The robber of the San Bernardino US Bank location provided a similar justification for the robbery to that provided by CAMPOS in the Redlands US Bank robbery, by telling victim bank employees he needed to pay off his mortgage.

d.    The robber of the San Bernardino US Bank location used a 2021, grey, four-door Nissan Maxima, just like CAMPOS did in the Redlands US Bank robbery.

e.    The robber of the San Bernardino US Bank location possessed a firearm in a black holster, just as CAMPOS did during the Redlands US Bank robbery.

f.    The robber of the San Bernardino US Bank location possessed a firearm that a witness described as "dark silver," which is consistent with the appearance of the Smith & Wesson Pistol CAMPOS carried during the Redlands US Bank robber, which was black and silver.

### TRAINING AND EXPERIENCE ON ROBBERY AND FIREARMS OFFENSES

33. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct armed robbery investigations, I am aware of the following:

a.   Persons who possess and use firearms in furtherance of crimes of violence generally maintain records of their firearm possession and violent crimes in their digital devices.

b.   Many people also keep mementos of their firearms and crimes of violence including digital photographs or recordings of themselves possessing or using firearms and the proceeds of robberies on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who possess firearms and commit armed robberies also often communicate with others about the proceeds of their robberies in some for or another.  Such correspondence includes sending images of firearms and currency.  In my experience, individuals who communicate about the proceeds of an armed robbery frequently use phone calls, e-mail, and text messages to communicate about the proceeds of a robbery.

d.   Armed robbers also generally research and scout locations they intended to rob.  Evidence of research and scouting is generally found on digital devices.  Robbers will search for information on locations they intend to rob, will save images of locations they intend to rob, and will call locations they intend to rob to verify current hours of operation.  Additionally, when robbers scout locations, they may take digital devices with them and the location data from those devices will reveal when the digital device was in the vicinity of a robbery location before a robbery.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

34.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

35.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, *inter alia*, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

36.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

     b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    37.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

     a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

     b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CAMPOS's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of CAMPOS's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

38.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

## <u>CONCLUSION</u>

39.    For all of the reasons described above, there is probable cause to believe that CAMPOS has committed violations of the Subject Offenses.    There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 6th day of
January 2022.

_____
HONORABLE KENLY KIYA KATO
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), seized on November 26, 2021 and currently maintained in the custody of the Federal Bureau of Investigation in Riverside, California:

1.  Silver and white iPhone X in a black Otterbox case ("SUBJECT DEVICE 1"); and

2.  Black iPhone X in a black Otterbox case ("SUBJECT DEVICE 2").

**ATTACHMENT B**

**I.  ITEMS TO BE SEIZED**

1.  The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2113(a) (Bank Robbery) and 924(c) (Possession of Firearm in Furtherance of a Crime of Violence) (the "Subject Offenses"), namely:

a.  Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations or relating to banks;

c.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

      d.    Records, documents, programs, applications, materials, or conversations relating to the sale or purchase of guns or ammunition, including correspondence, receipts, records, and documents noting prices or times when guns or ammunition were bought, sold, or otherwise distributed;

      e.    Audio recordings, pictures, video recordings, or still captured images related to banks, firearms, and US currency;

      f.    Contents of any calendar or date book;

      g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations between October 1, 2021 and November 26, 2021; and

      h.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

      i.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

        i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.    evidence of the presence or absence of software that would allow others to control the device, such as

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v. evidence of the times the device was used;

        vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii. records of or information about Internet Protocol addresses used by the device;

        ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

II.  **SEARCH PROCEDURE FOR DIGITAL DEVICE(S)**

3.    In searching the SUBJECT DEVICE(S) (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or

5

encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f. If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g. If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h. If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies

of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.    The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.    After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.    During the execution of this search warrant, law enforcement is permitted to (1) depress Osbaldo Campos, Jr.'s thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICES (only if the device has such a sensor), and direct which

specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Osbaldo Campos, Jr.'s face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

6.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.